# EXHIBIT 1



# **National Bi◌Fuels**

5120 Woodway #10010
Houston, Texas 77056
Phone:    713. 353.7060
FAX:      713. 993.0076

## CONFIRMATION LETTER

**CONFIDENTIALITY NOTICE:** The information is intended only for the use of the individual or entity named below. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents.

**Date:**    December 16, 2005

**Buyer:**    Royal Caribbean Cruises LTD. ("RCL")

**Seller:**    National Biofuels, L.P. ("NBF")

The purpose of this Confirmation is to confirm the terms and conditions of the purchase and sale of Biodiesel agreed upon by Buyer and Seller for the Term of this Contract specified below. This Confirmation is being provided pursuant to, in accordance with, and is subject to, the provisions included in the "Base Contract for the Purchase and Sale of Biodiesel" ("Base Contract"). In the event of conflict between the terms of this Confirmation and the Base Contract, the terms of this Confirmation shall prevail. A signed Confirmation together with the Base Contract shall constitute the "Contract."

## We confirm the following terms of our Transaction:

**Product:**    No greater than 99.9% in volume of Agri-biodiesel that meets ASTM 6751 standards for biodiesel, as such standards may change from time to time during the Term of this Agreement, and which is similar to the typical specification listed in Exhibit 1 and that is manufactured from Palm oil or Palm Olein and no less than 0.01% in volume of diesel that meets the ISO 8217 for DMA

**Term:**    January 24, 2006 through December 31, 2008

**Biodiesel Price:**    $1.48/gallon delivered FOB Location plus applicable United States Internal Revenue Service Fuel Excise Tax (currently $0.244/gal delivered).

The parties acknowledge that the above price per gallon takes into account the benefit of the tax credit that Seller expects to receive in connection with its sale of the Product to Buyer in accordance with Section 40A of the Internal Revenue Code of 1986 and as amended. In the event that Seller is unable to take full advantage of the tax credit for any reason (including as a result of a disallowance or similar adverse ruling or determination by the Internal Revenue

1 of 15                                    CONFIDENTIAL

Service), Seller shall not seek compensation from Buyer for such loss with respect to Product previously sold to Buyer hereunder.  In addition, Seller shall indemnify and hold Buyer harmless against all loss, damage and expense arising from any claims that may be made against Buyer by the Internal Revenue Service or other third party in the event of any disallowance or similar adverse ruling or determination with respect to the ability of Seller to claim the tax credit for Product previously sold to Buyer hereunder.

**Annual Commitment/Monthly Quantity:**

For each calendar year for the Term hereof, Buyer commits to purchase the minimum Annual Quantities set forth in Exhibit 2 and Seller commits to sell the minimum Annual Quantities set forth in Exhibit 2.  In the event that either party fails to meet the Annual minimum quantities in any year (the "Non-Performing Party"), such party shall compensate the performing party with respect to such shortfall in accordance with the provisions of Section 3 in the Base Contract.

Exhibit 3 sets forth the estimated Monthly Quantities that Buyer expects to purchase during the Term hereof.  In the event that Buyer fails to purchase the specified minimum Monthly Quantities, Buyer will seek to make up any shortfall in the subsequent month ("Monthly Shortfall"); however, Seller acknowledges that Buyer shall not be liable for any Monthly Shortfall or for any failure to make up for the Monthly Shortfall to the extent that the Monthly Shortfall is 2000 MT or less.  In the event that the Monthly Shortfall exceeds 2000 MT for any month, Buyer shall compensate Seller for the Monthly Shortfall in excess of 2000 MT in accordance with Section 3 of the Base Contract.  Any such excess for which Buyer compensates Seller shall be treated as purchased Product for purposes of calculating Buyer's required annual commitment. .

To assist Seller in projecting Buyer's Monthly Quantity for Product, Buyer shall provide Seller by the tenth day of each month during the Term hereof with a list of the monthly quantities that it expects to purchase for the then remaining months of the Term. Buyer's current Monthly Quantity is set forth in Exhibit 3.

**Location:**

Berth 70-71, or road rack (at Buyer's option) at Westway Terminal Company, Signal St., San Pedro, CA  90733-0790. Buyer shall be allowed to take up to 12 truck deliveries in any calendar year (with reasonable notice provided to Seller). Seller shall use reasonable efforts to accommodate additional truck deliveries.

**Delivery Point:**

Buyer to receive at Location listed above at the inlet flange to vessel, barge or truck, as the case may be.

**National BioFuels**

CONFIDENTIAL

**Payment:**          Buyer will pay the Biodiesel Price multiplied by the number of
                      gallons received at the Location. The quantity shipped will be
                      verified by independent inspectors.

**Payment Terms:**    Payment is based on FOB Location and is due 5 days from receipt of
                      original invoice. Payment will be made via Fed Wire Transfer to a
                      US-based financial institution.

**Cancellation:**     Buyer has the option to cancel Contract without liability if (i) Seller
                      fails to deliver Product that does not meet ASTM 6751 specifications
                      (including situations involving the presence metal contaminants in
                      the Product) or (ii) if the Product adversely affects in a material
                      manner (determined from either an operational or economic
                      perspective) the operation of the vessel engines of the Buyer (e.g., ,
                      creates filter problems, clogging problems or combustion problems).
                      Prior to canceling this Contract in accordance with the preceding
                      sentence, Buyer will notify Seller in writing of the situation and also
                      provide a detailed description of the problem occurring with the fuel
                      specifications of the vessel engines, as the case may be ("Buyer's
                      Notification") and both parties will seek to rectify the situation.
                      Should the situation not be resolved to Buyer's satisfaction within
                      three months of Seller's receipt of Buyer's Notification, Buyer may
                      elect at its option to cancel the Contract.

**Wire Transfer to:** Bank: JP Morgan Chase
                      ABA: 113000609
                      Acct: 00113435433
                      For further credit to: National Biofuels LP

**Scheduling:**       Buyer      305.982.2706
                      Seller     713.454.7060

**Special Provisions:** (as required)


AGREED TO AND ACCEPTED BY:

**National Biofuels, L.P.**                    **ROYAL CARIBBEAN CRUISES LTD.**
5120 Woodway Dr #10010                         Address: 1050 Caribbean Way
Houston, Texas 77056                           City, St., Zip: Miami FL 33132
Phone:  713. 353.4746                          Phone: 305 931 2736
Fax:    713. 456.2617                          Fax: 305 992 2966

By: _____                          By: _____
Name: Gerardo Manalac                          Name: Richard Fain
Title: Chairman                                Title: CEO + Chairman


**National Bi🌊Fuels**                                    CONFIDENTIAL

## BASE CONTRACT FOR THE PURCHASE AND SALE OF BIODIESEL ("BASE CONTRACT")

1.  DEFINITIONS:

   a.   "Business Day" shall mean any day other than Saturday, Sunday or a public holiday in the State of Texas or the United States of America.

   b.   "Contract" shall mean this Base Contract and the terms and conditions of any Confirmation Letter accepted by Buyer with respect to this Base Contract.

   c.   "Contract Price" shall mean the amount expressed in U.S. Dollars per gallon to be paid by Buyer to Seller for the purchase of Product as agreed to by the parties in a transaction.

   d.   "Contract Quantity" shall mean the quantity of Product to be delivered and taken as agreed to by the parties in a transaction.

   e.   "Cover Standard", as referred to in Section 3, shall mean that if there is an unexcused failure to take or deliver any quantity of Product pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Product, (or an alternate product if elected by Buyer and replacement Product is not available), or (ii) if Seller is the performing party, sell Product, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Product consumption needs or Seller's Product sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

   f.   "Day" shall mean a consecutive twenty-four (24) hour period commencing at 00:00 hours Central Time and ending at 23:59:59 hours Central Time.

   g.   "Green Tags" means (i) any and all credits, benefits, certificates, or similar instruments or rights issued, recognized, created or authorized for the non-energy attributes which are associated with or derived from the use of Product as a fuel for energy generation or transportation in contrast to the use of coal, fuel oil or other fossil fuels for energy generation or transportation; and (ii) any and all credits, benefits, certificates, or similar instruments or rights issued, recognized, created or authorized under private contracts or any statute, regulation, order or regulatory or governmental program, or voluntary program for renewable energy or green pricing or any other renewable energy mandate or objective which result or arise from or are attributable to the use of Product for energy generation or transportation fuel or are associated with Product being a "green" or renewable fuel.

   h.   "Product" also designated as "Biodiesel" or "Blender B99.9", means a fuel comprised of mono-alkyl esters of long chain fatty acids derived from vegetable oils or animal fats that, for the Agri-biodiesel component of the Product, meets the requirements of the American Society for Testing and Materials International (ASTM) specification for ASTM D6751-03 or other specification agreed upon by both Parties.

   i.   "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

   j.   "Quantity" shall mean the quantity of Product to be delivered and taken as agreed to by the parties in a transaction for a given calendar year.

   k.   "Payment Date" shall mean a date, as indicated on this Base Contract, on or before which payment is due Seller for Product received by Buyer in the previous Month.

2.  TITLE: Title to the Product shall pass from Seller to Buyer at the Delivery Point(s). Title to the Product shall include any Green Tags associated with the Product. Seller shall have responsibility for and assume any liability with respect to the Product prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and any liability with respect to said Product after its delivery to Buyer at the Delivery Point(s). Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Product sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 2 AND IN SECTION 20.h, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury or property damage from said Product or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Product or other charges thereon which attach after title passes to Buyer. Notwithstanding the other provisions of this Section 2, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Product delivered by Seller to meet the quality requirements of Section 6, provided, that Seller's maximum liability for such Claims shall be no greater than the product of the Contract Price multiplied by the quantity of Product failing to meet the quality requirements of Section 6.

3. PERFORMANCE OBLIGATIONS: Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract. The sole and exclusive remedy of the parties in the event of a breach of an obligation to deliver or receive Product shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s) and additional storage costs incurred in a commercially reasonable manner, multiplied by the difference between the amount that Seller was otherwise obligated to deliver under the Contract for such Day(s) and the quantity of Product actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Product, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s) and additional storage costs incurred in a commercially reasonable manner, multiplied by the difference between the amount that Buyer was otherwise obligated to purchase under the Contract and the quantity of Product actually taken by Buyer for such Day(s). The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated. Notwithstanding anything to the contrary herein, the maximum liability of the non-performing party for the amount of such unfavorable difference shall be no greater than the product of (a) the Contract Price multiplied by (b) the difference between (1) the amount that Seller was otherwise obligated to deliver under the Contract for such Day(s) and (2) the quantity of Product actually delivered by Seller, in the case of clause (i) above, or the quantity of Product actually taken by Buyer, in the case of clause (ii) above.

4. ASSIGNMENT OF COSTS: Seller agrees to arrange transportation and/or storage as necessary to take receipt of the Quantity at the Location. Buyer will be responsible for all costs and arrangements to purchase and provide Transport of Product from the Delivery Point. Seller will be responsible for all costs and arrangements to purchase and provide Transport of Product to the Delivery Point.

5. INSPECTION AND MEASUREMENT: Measurement of the volume of Product delivered under this Contract will be accomplished by Seller using either gauging or meter readings of shore tanks, delivery vessels, barges, or pipelines. All measurement and gauging under this Agreement will be made in accordance with the latest approved methods of the American Petroleum Institute ("API") at the time such measurements are made and in the absence of such approved methods, in accordance with those of the American Society of testing and Materials. All volume of delivered Product will be corrected for temperature 60 degrees Fahrenheit in accordance with the latest API volume correction factors for such Product. Seller's measurement of the quantity of Product delivered will be conclusive, absent manifest error. Buyer may have a representative present to observe the measurement of the volume of the Product delivered. At each Product delivery, Seller shall collect three samples of the Product from the in-line delivery equipment and sign, seal and label the retained samples. Buyer may have a representative present at the time of sampling. Seller will provide one sample to Buyer and will provide one sample to an independent reference laboratory.

6. CERTIFICATION OF ASTM 6751: Seller shall certify that the lot of the Agri-biodiesel component of the Product delivered to the Buyer meets ASTM 6751 standards for biodiesel by providing the results, at Buyer's request, from an independent reference laboratory of the lot of the Agri-biodiesel component

**National BioFuels**                                                CONFIDENTIAL

Product delivered to the Buyer.

7.  DELIVERIES: Deliveries shall be made at such times as may be required by the receiving party, provided that reasonable advance notice of each delivery required has been given Buyer. At the time of giving such notice, Buyer shall furnish Seller necessary shipping instructions. Seller shall prepare and furnish the receiving party with copies of bills of lading and other shipping papers.

8.  TAXES: Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to Product prior to the Delivery Point(s) and all Taxes at the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Product after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof. In those cases in which the laws, regulations or ordinances impose upon Seller the obligation to collect from Buyer such taxes, excises, charges and inspections or other fees, Buyer shall pay to Seller amounts equivalent to such governmental requirements (listed above) for which Buyer shall be liable. If Buyer is entitled to purchase products free of any tax, fee or charge, Buyer shall furnish to Seller proper exemption certificates to cover such purchase or purchases.

9.  CREDITS: Seller shall be entitled to all credits, tax exemptions, tax credits, and excise tax credits ("Credits") related to the Product that arises as a result of Seller's ownership, processing, possession or use of the Product through the date of Delivery.

10. GREEN TAGS: Upon taking title to the Product, Buyer takes any and all rights, title and interest in and to any and all Green Tags that result or arise from or are attributable to the use of Product, whether arising or coming into existence before or after the sale of Product under this Contract. Seller agrees to cooperate, at Buyer's expense, in any and all additional actions as may be reasonably necessary to: (i) procure any certificates or credits that may be issued or are issuable by any government or regulatory agency and that are included in the definition of Green Tags; and (ii) effect and record or otherwise evidence the assignment to Buyer of any and all of Seller's right, title and interest in and to such Green Tags when and as they are generated (including such certificates or credits when and as they are issued) on such periodic basis as may be required by law or as Buyer may reasonably request without any cost, fee or charge . Buyer shall pay or reimburse Seller for all out-of-pocket expenses incurred by Seller in connection with any actions contemplated by the provisions set forth in (i) and (ii) above.

11. WARRANTIES AND INDEMNIFICATION: Seller warrants title to Products delivered hereunder, that Seller has the right to sell such Product and that it is free from liens and adverse claims of every kind. Seller will pay all royalties and other sums due on production, processing or handling of Product delivered herein, unless otherwise specified. Seller will indemnify and hold Buyer harmless against all loss, damage and expense on account of adverse claims to Products delivered or of royalties, payments or other charges thereon applicable before or upon delivery. Buyer will indemnify and hold Seller harmless against all loss, damage and expense on account of adverse claims to Products delivered or of royalties, payments or other charges thereon applicable at or after delivery. Seller warrants that it has complied with all laws, orders, rules, regulations or acts of any government or governmental body or authority having jurisdiction over the production, manufacture, preparation, sale or transportation of Products delivered.

12. PAYMENTS: Seller shall invoice Buyer when Product has been delivered, received, tested, measured, and certified (pursuant to Section 5, 6, and 7). Buyer shall remit the amount due in immediately available funds 5 Days after receipt of the original invoice by Buyer ("Payment Date"); provided that if the Payment Date is not a Business Day, payment is due on the Business Day preceding that date.

13. DISPUTED PAYMENTS: Either Party may, in good faith, dispute the correctness of any invoice or any adjustment to any invoice rendered hereunder. Immediately following the receipt of notice of a disputed invoice amount, the parties shall meet within two (2) Business Days and shall undertake good faith efforts to resolve any dispute. These efforts may include, but not be limited to, an analysis of the invoice calculation methodology substantiated by relevant information provided by either Party. In the event the Parties are unable to resolve the dispute following receipt of the invoice, then payment for the total amount of the invoice less the disputed amount, shall be made when due, with written notice of the

**National Bi⊙Fuels**

CONFIDENTIAL

dispute (including the basis for the dispute) accompanying such payment. If a party is found to have overpaid an invoice, that party shall be due an immediate refund of such overpaid amount, including any accrued interest at the Interest Rate defined as the lower of (i) 15% per annum or (ii) the maximum rate permitted by applicable laws until paid. If a party is found to owe additional funds, such party shall immediately remit payment, including any accrued interest on the additional funds owing but unpaid at the Interest Rate specified in this Section 13 from the date such additional funds were originally due until paid.

14. FINANCIAL RESPONSIBILITY:

   a. In the event (each an "Event of Default") either party (the "Defaulting Party") or its guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; or (vi) not have paid any amount due the other party hereunder on or before the third Business Day following written Notice that such payment is due; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 14.b, in addition to any and all other remedies available hereunder.

   b. If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination this Contract. On the Early Termination Date, this Contract will terminate.

   c. As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Product delivered and received between the parties under this Contract on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3), for which payment has not yet been made by the party that owes such payment under this Contract.

   d. The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 14.c, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount"). At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff (i) any Net Settlement Amount owed to the Non-Defaulting Party against any margin or other collateral held by the Non-Defaulting Party relating to the Contract; or (ii) any Net Settlement Amount payable to the Defaulting Party against any amount(s) payable by the Defaulting Party to the Non-Defaulting Party under any other agreement or arrangement between the parties.

   e. The Non-Defaulting Party's remedies under this Section 14 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date. Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

15. CHANGE IN LAW. If, after the date of execution of this Contract, the government of the United States of America or any state thereof, or any branch, division, or agency of such government, issues, adopts, imposes, promulgates, cancels, or modifies any status, ordinance, law, directive, order, resolution, or the like, or issues a public notice or private ruling to Buyer or Seller with respect to or any such statute, ordinance, law, directive, order, resolution, or the like, which materially alters, impairs, or hinders the obligations or requirements of Seller or Buyer under this Contract or which materially changes, alters, impairs, or hinders the economic benefits anticipated to accrue to the Seller or Buyer under this Contract upon the date of execution hereof (a "Change in Law"), Buyer and Seller shall renegotiate in good faith the commercial terms of this Contract. In event that the parties are unable to reach agreement on the

**National BioFuels**                                              CONFIDENTIAL

revised commercial terms within ten days, either party may terminate this Contract without liability upon twenty (20) days written notice to the other party.

16. FORCE MAJEURE: If either party is rendered unable by force majeure, wholly or in part, to perform or comply with any obligation or condition of this Agreement, upon such party's giving timely notice and reasonably full particulars to the other party such obligation or condition shall be suspended during the continuance of the inability so caused and such party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period provided obligations to make payments then due for products delivered hereunder shall not be suspended.. The party having the difficulty shall notify the other party of any change in circumstances giving rise to the suspension of its performance and of its resumption of performance under this Agreement. The term "force majeure" shall include, without limitation by the following enumeration, Acts of God, war, terrorism, the elements, fire, accidents, breakdowns, strikes, lockouts, differences with workmen, and any other industrial, civil or public disturbance, interruption of deliveries of Product to Seller from Seller's upstream suppliers for any reason (including, for the avoidance of doubt, by reason of breach of contract by such upstream suppliers), or any act or omission beyond the control of the party having the difficulty, and any restrictions or restraints imposed by laws, orders, rules, regulations or acts of any government or governmental body or authority, civil or military. The term "force majeure" shall not include (i) strikes, lockouts or slowdowns by Seller's or Buyer's work force, or (ii) loss of Buyer's markets or Buyer's inability economically to sell or reuse the product hereunder. No event shall be considered to be Force Majeure unless it is reasonably beyond the control of either party or either party's subcontractors and could not have been anticipated by such party when signing this Contract.

17. DISPUTE RESOLUTION AND ARBITRATION. The parties shall make a good faith effort to settle any dispute arising out of or relating to this Agreement, or the breach hereof. If such a dispute cannot be settled amicably between the parties within thirty (30) Days after the giving of notice by either party of the existence of such dispute, then the dispute claim shall be exclusively referred to and finally settled by binding arbitration pursuant to the arbitration rules set forth by the United Nations Commission on International Trade Law (UNCITRAL) Rules of Arbitration, as then in effect and as may be modified by the rest of this Section 17. Each arbitral tribunal shall consist of a panel of three arbitrators (or such lesser number as the parties may agree) appointed in accordance with the UNCITRAL Rules. If any party fails to timely appoint an arbitrator in accordance with the UNCITRAL Rules, or if the two party-appointed arbitrators fail to timely appoint a third arbitrator, upon the request of either party the International Chamber of Commerce Court of Arbitration shall act as appointing authority for such arbitrators. The arbitration proceedings shall be conducted in New York, New York and in the English language, and the award rendered in the English language. The award of the arbitrators shall be final and binding, and shall be the sole and exclusive remedy between the parties regarding any controversy, claims, counterclaims, issues, or accountings, presented to the tribunal. Any monetary award shall be made and payable in United States Dollars, free of any tax or other deduction, and shall include interest from the date of any breach or other violation of this Agreement to the date on which the award is paid, at a rate determined by the arbitrators. The costs and fees of the arbitration shall be allocated by the arbitrators, who shall have the authority to award costs and fees to the prevailing party. The arbitral award shall be enforceable by any court having jurisdiction for that purpose.

18. LIMITATIONS: FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES IS WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED

**National BioFuels**                                                    CONFIDENTIAL

THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE IS SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

19. NOTICES: All Notices required hereunder may be sent by facsimile or mutually acceptable electronic means or an internationally recognized overnight courier service. Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the Day on which such facsimile is received is not a Business Day or is after five p.m. Central Time on a Business Day of the addressee, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by international courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party.

20. MISCELLANEOUS:

   a.  This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party. Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

   b.  If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

   c.  No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

   d.  This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.

   e.  The interpretation and performance of this Contract shall be governed by the laws of the State of New York, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

   f.  This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, this Contract or transaction or any provisions thereof.

   g.  There is no third party beneficiary to this Contract.

   h.  Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

   i.  The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

**National Bio Fuels**                                         CONFIDENTIAL

j.   Unless the parties have provided written consent, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract, (iii) to the extent necessary to implement any transaction, or (iv) to the extent such information is delivered to such third party for the sole purpose of calculating a published index. Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure. The existence of this Contract is not subject to this confidentiality obligation. Subject to Section 18, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation. The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

k.   In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

l.   This Contract constitutes the entire agreement between the parties. No promises, agreements or warranties additional to this Agreement shall be deemed a part thereof, nor shall any alteration or amendment of this Agreement be effective without the express written agreement of both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

**National Biofuels L.P.**

By: _____

Name: Gerardo Manalac

Title: Chairman

**Royal Caribbean Cruises, LTD.**

By: _____

Name: Richard Fain

Title: CEO + Chairman



National BioFuels/Paramount Petroleum Agreement                    11 of 15

Exhibit 1-TYPICAL SPECIFICATION

| No. | Parameters | Test method | Specification |
|---|---|---|---|
| 1. | FLASH POINT ( 0 C ) | D93 | 130 MINIMUM |
| 2. | WATER CONTENT | D2709 | 500 mg/KG MAXIMUM |
| 3. | VISCOSITY AT $40^0$ C | D445 | 1.9 – 6.0 MAXIMUM |
| 4. | ACID VALUE (MG/KOH/G) | D664 | 0.8 MAXIMUM |
| 5. | PHOSPORUS CONTENT | D4951 | 10 MG/KG MAXIMUM |
| 6. | SULFATED ASH | D874 | 200 mg/kg maximum |
| 7. | SULFUR | D5453 | 15 mg/kg maximum |
| 8. | COPPER STRIP CORROSION | D130 | No. 3 max |
| 9. | CETANE NUMBER | D613 | 47 minimum |
| 10. | CLOUD POINT | D2500 | Report |
| 11. | CARBON RESIDUE | D4530 | 500 mg/kg maximum |
| 12. | FREE GLYCERIN | D6584 | 100 mg/kg maximum |
| 13. | TOTAL GLYCERIN | D6584 | 1800 mg/kg maximum |
| 14. | DISTILLATION TEMP | D1160 | 360 Degrees c maximum |
| 15. | POUR POINT | D97 | -7 degrees c |

**National BiOFuels**

CONFIDENTIAL

EXHIBIT 2-

MINIMUM ANNUAL QUANTITIES

| Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) |
|---|---|---|---|---|---|---|---|---|
| 2006 | 40,000 | 45,000 | 2007 | 45,000 | 50,000 | 2008 | 30,000 | 35,000 |

CONFIDENTIAL

CONFIDENTIAL

Exhibit 3
MONTHLY QUANTITIES

| Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) |
|---|---|---|---|---|---|---|---|---|
| Jan-06* | 1,500 (as available) | | Jan-07 | 6,000 | 6,500 | Jan-08 | 4,000 | 4,500 |
| Feb-06 | 2,000 | 2,500 | Feb-07 | 3,000 | 3,500 | Feb-08 | 2,000 | 2,500 |
| Mar-06 | 4,000 | 5,000 | Mar-07 | 4,500 | 5,000 | Mar-08 | 3,000 | 3,500 |
| Apr-06 | 6,500 | 7,500 | Apr-07 | 7,000 | 7,500 | Apr-08 | 5,000 | 5,500 |
| May-06 | 4,000 | 4,500 | May-07 | 4,500 | 5,000 | May-08 | 3,000 | 3,500 |
| Jun-06 | | | Jun-07 | - | | Jun-08 | - | |
| Jul-06 | | | Jul-07 | - | | Jul-08 | - | |
| Aug-06 | | | Aug-07 | - | | Aug-08 | - | |
| Sep-06 | 7,000 | 7,500 | Sep-07 | 6,000 | 6,500 | Sep-08 | 3,000 | 3,500 |
| Oct-06 | 8,000 | 8,500 | Oct-07 | 7,000 | 7,500 | Oct-08 | 5,000 | 5,500 |
| Nov-06 | 3,000 | 4,000 | Nov-07 | 3,000 | 3,500 | Nov-08 | 2,000 | 2,500 |
| Dec-06 | 4,000 | 5,500 | Dec-07 | 4,000 | 5,000 | Dec-08 | 3,000 | 4,000 |

* Minimum/Maximum Quantity in Q1 of 2006 will be adjusted by the actual amount delivered in January 2006.
MT is Metric Tonnes

**National BioFuels**                                    CONFIDENTIAL

**National Bio Fuels**                              CONFIDENTIAL

# EXHIBIT 2



"GP Manalac"
<gpmanalac@fulcrumpower.c
om>

04/18/2007 01:55 PM

To  <MMcNamara@rccl.com>

cc  "Kevin Gorman - Contacts"
     <kgorman@nationalbiofuels.com>

bcc

Subject  RE: Urgent - Need to discuss inventory issue

I will call you in 15 minutes to review this and our position.

**From:** MMcNamara@rccl.com [mailto:MMcNamara@rccl.com]
**Sent:** Wednesday, April 18, 2007 12:05 PM
**To:** GP Manalac
**Subject:** Re: Urgent - Need to discuss Inventory issue

I can hold off for now, if you call me before 2:45 eastern time. I will be unavaiable from3:00pm - 5:00pm.

----- Original Message -----
From: "GP Manalac" [gpmanalac@fulcrumpower.com]
Sent: 04/18/2007 11:30 AM EST
To: Michael McNamara; <gpmanalac@nationalbiofuels.com>
Cc: Paul Litvinov; "Kevin Gorman - Contacts" <kgorman@nationalbiofuels.com>
Subject: RE: Urgent - Need to discuss inventory issue

I need about another two hours because we are still getting final inventory numbers from Westway. I want
to give you the most up to date info on where things stand when I call.

**From:** MMcNamara@rccl.com [mailto:MMcNamara@rccl.com]
**Sent:** Wednesday, April 18, 2007 11:04 AM
**To:** gpmanalac@nationalbiofuels.com
**Cc:** PLitvinov@rccl.com; Kevin Gorman - Contacts
**Subject:** Urgent - Need to discuss inventory issue

GP,

I am sending you this email because I need to talk to you urgently and you have not returned my calls yet.
I spoke with Kevin about this matter, but all he can do is recommend that I call you.

The core issue is, that based on information we have received, you have loaded out a cargo of biodiesel
from Westway that is the product that you have already sold to us; furthermore, that as a result of this
shipment you may not be able to deliver the biodiesel scheduled for pickup this week by Jankovich.

When Paul questioned Kevin about this last night, Kevin said that it was your position that we do not own
any of the biodiesel in the terminal. I need to know what NBF's official position is so we can work this out.
Time is of essence on this issue, and if I do not hear from you by 1:00PM, I will have to contact our
attorneys and our insurance carrier and put them on notice of the potential loss/theft of
Royal Caribbean Cruises Ltd. assets. I also need to know immediately if you are in a position to meet this

weeks biodiesel nomination, If I do not hear from you I will have to commit to buy MGO because I will not risk the potential of not having fuel for Infinity on Sunday.

I truly hope to avoid this process which will undoubtedly get very ugly and costly for NBF. If you get in touch with me we should be able to get a better understanding of the issue and hopefully find a simple resolution.

Michael T. McNamara
Director, Fuel Supply
Royal Caribbean Cruises Ltd.
(305) 539-6010 Office
(786) 546-3468 Cell



mmcnamar@rccl.com calculation.xls

2007 Contract calculation

|  | | | |
|---|---|---:|---|
| | jan | 6,000 | contract (in MT) |
| | feb | 3,000 | contract (in MT) |
| | mar | 4,500 | contract (in MT) |
| | april | 7,000 | contract (in MT) |
| | total | 20,500 | total |
| | Carryover | (2,000) | carryover per the contract |
| | Total actual take | (6,926) | Jan-Apr |
| | take or pay obligation | 11,574 | |
| | conversion from mt to gal | 301 | x |
| | total gallons | 3,483,857 | |
| per contract | take or pay obligation | 5,156,108 | gallons x $1.48/gal |
| Cover standard | revenue from sales | (3,650,000) | 7300 MT x $500/MT (est) with the est 4200 MT in tank worth nothing because it is frozen (due to RCCL not taking it) |
| less costs | cost from storage | 424,840 | from previous spreadsheet provided to RCCL |
| less costs | opportunity cost for storage | 1,324,964 | from previous spreadsheet provided to RCCL |
| | Total owed by RCCL | 3,255,913 | |
| | Less deposit made | (2,278,483) | current deposit balance + 650 MT taken April 21 |
| | Total balance | 977,430 | positive means RCCL owes NBF |