revised commercial terms within ten days, either party may terminate this Contract without liability upon twenty (20) days written notice to the other party.

16. FORCE MAJEURE: If either party is rendered unable by force majeure, wholly or in part, to perform or comply with any obligation or condition of this Agreement, upon such party's giving timely notice and reasonably full particulars to the other party such obligation or condition shall be suspended during the continuance of the inability so caused and such party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period provided obligations to make payments then due for products delivered hereunder shall not be suspended. The party having the difficulty shall notify the other party of any change in circumstances giving rise to the suspension of its performance and of its resumption of performance under this Agreement. The term "force majeure" shall include, without limitation by the following enumeration, Acts of God, war, terrorism, the elements, fire, accidents, breakdowns, strikes, lockouts, differences with workmen, and any other industrial, civil or public disturbance, interruption of deliveries of Product to Seller from Seller's upstream suppliers for any reason (including, for the avoidance of doubt, by reason of breach of contract by such upstream suppliers), or any act or omission beyond the control of the party having the difficulty, and any restrictions or restraints imposed by laws, orders, rules, regulations or acts of any government or governmental body or authority, civil or military. The term "force majeure" shall not include (i) strikes, lockouts or slowdowns by Seller's or Buyer's work force, or (ii) loss of Buyer's markets or Buyer's inability economically to sell or reuse the product hereunder. No event shall be considered to be Force Majeure unless it is reasonably beyond the control of either party or either party's subcontractors and could not have been anticipated by such party when signing this Contract.

17. DISPUTE RESOLUTION AND ARBITRATION. The parties shall make a good faith effort to settle any dispute arising out of or relating to this Agreement, or the breach hereof. If such a dispute cannot be settled amicably between the parties within thirty (30) Days after the giving of notice by either party of the existence of such dispute, then the dispute claim shall be exclusively referred to and finally settled by binding arbitration pursuant to the arbitration rules set forth by the United Nations Commission on International Trade Law (UNCITRAL) Rules of Arbitration, as then in effect and as may be modified by the rest of this Section 17. Each arbitral tribunal shall consist of a panel of three arbitrators (or such lesser number as the parties may agree) appointed in accordance with the UNCITRAL Rules. If any party fails to timely appoint an arbitrator in accordance with the UNCITRAL Rules, or if the two party-appointed arbitrators fail to timely appoint a third arbitrator, upon the request of either party the International Chamber of Commerce Court of Arbitration shall act as appointing authority for such arbitrators. The arbitration proceedings shall be conducted in New York, New York and in the English language, and the award rendered in the English language. The award of the arbitrators shall be final and binding, and shall be the sole and exclusive remedy between the parties regarding any controversy, claims, counterclaims, issues, or accountings, presented to the tribunal. Any monetary award shall be made and payable in United States Dollars, free of any tax or other deduction, and shall include interest from the date of any breach or other violation of this Agreement to the date on which the award is paid, at a rate determined by the arbitrators. The costs and fees of the arbitration shall be allocated by the arbitrators, who shall have the authority to award costs and fees to the prevailing party. The arbitral award shall be enforceable by any court having jurisdiction for that purpose.

18. LIMITATIONS: FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES IS WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED

THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE IS SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

19. NOTICES: All Notices required hereunder may be sent by facsimile or mutually acceptable electronic means or an internationally recognized overnight courier service. Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the Day on which such facsimile is received is not a Business Day or is after five p.m. Central Time on a Business Day of the addressee, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by international courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party.

20. MISCELLANEOUS:

   a. This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party. Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

   b. If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

   c. No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

   d. This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.

   e. The interpretation and performance of this Contract shall be governed by the laws of the State of New York, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

   f. This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, this Contract or transaction or any provisions thereof.

   g. There is no third party beneficiary to this Contract.

   h. Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

   i. The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

j.  Unless the parties have provided written consent, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract, (iii) to the extent necessary to implement any transaction, or (iv) to the extent such information is delivered to such third party for the sole purpose of calculating a published index. Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure. The existence of this Contract is not subject to this confidentiality obligation. Subject to Section 18, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation. The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

k.  In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

l.  This Contract constitutes the entire agreement between the parties. No promises, agreements or warranties additional to this Agreement shall be deemed a part thereof, nor shall any alteration or amendment of this Agreement be effective without the express written agreement of both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

National Biofuels, L.P.  
By: _____  
Name: Gerardo Manalac  
Title: Chairman

Royal Caribbean Cruises, LTD.  
By: _____  
Name: Richard Fain  
Title: CEO + Chairman

National BioFuels/Paramount Petroleum Agreement                           11 of 15

Exhibit 1-TYPICAL SPECIFICATION

| No. | Parameters | Test method | Specification |
|---|---|---|---|
| 1. | FLASH POINT ( 0 C ) | D93 | 130 MINIMUM |
| 2. | WATER CONTENT | D2709 | 500 mg/KG MAXIMUM |
| 3. | VISCOSITY AT 40 $^0$ C | D445 | 1.9 – 6.0 MAXIMUM |
| 4. | ACID VALUE (MG/KOH/G) | D664 | 0.8 MAXIMUM |
| 5. | PHOSPORUS CONTENT | D4951 | 10 MG/KG MAXIMUM |
| 6. | SULFATED ASH | D874 | 200 mg/kg maximum |
| 7. | SULFUR | D5453 | 15 mg/kg maximum |
| 8. | COPPER STRIP CORROSION | D130 | No. 3 max |
| 9. | CETANE NUMBER | D613 | 47 minimum |
| 10. | CLOUD POINT | D2500 | Report |
| 11. | CARBON RESIDUE | D4530 | 500 mg/kg maximum |
| 12. | FREE GLYCERIN | D6584 | 100 mg/kg maximum |
| 13. | TOTAL GLYCERIN | D6584 | 1800 mg/kg maximum |
| 14. | DISTILLATION TEMP | D1160 | 360 Degrees c maximum |
| 15. | POUR POINT | D97 | -7 degrees c |

**National BioFuels**                                                CONFIDENTIAL

- EXHIBIT 2 -

MINIMUM ANNUAL QUANTITIES

| Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Year | Minimum Quantity (in MT) | Maximum Quantity (in MT) |
|---|---|---|---|---|---|---|---|---|
| 2006 | 40,000 | 45,000 | 2007 | 45,000 | 50,000 | 2008 | 30,000 | 35,000 |

12 of 15

CONFIDENTIAL

CONFIDENTIAL

Exhibit 3
MONTHLY QUANTITIES

| Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) | Month | Minimum Quantity (in MT) | Maximum Quantity (in MT) |
|---|---|---|---|---|---|---|---|---|
| Jan-06* | 1,500 (as available) | | Jan-07 | 6,000 | 6,500 | Jan-08 | 4,000 | 4,500 |
| Feb-06 | 2,000 | 2,500 | Feb-07 | 3,000 | 3,500 | Feb-08 | 2,000 | 2,500 |
| Mar-06 | 4,000 | 5,000 | Mar-07 | 4,500 | 5,000 | Mar-08 | 3,000 | 3,500 |
| Apr-06 | 6,500 | 7,500 | Apr-07 | 7,000 | 7,500 | Apr-08 | 5,000 | 5,500 |
| May-06 | 4,000 | 4,500 | May-07 | 4,500 | 5,000 | May-08 | 3,000 | 3,500 |
| Jun-06 | | | Jun-07 | - | | Jun-08 | - | |
| Jul-06 | | | Jul-07 | - | | Jul-08 | - | |
| Aug-06 | | | Aug-07 | - | | Aug-08 | - | |
| Sep-06 | 7,000 | 7,500 | Sep-07 | 6,000 | 6,500 | Sep-08 | 3,000 | 3,500 |
| Oct-06 | 8,000 | 8,500 | Oct-07 | 7,000 | 7,500 | Oct-08 | 5,000 | 5,500 |
| Nov-06 | 3,000 | 4,000 | Nov-07 | 3,000 | 3,500 | Nov-08 | 2,000 | 2,500 |
| Dec-06 | 4,000 | 5,500 | Dec-07 | 4,000 | 5,000 | Dec-08 | 3,000 | 4,000 |

* Minimum/Maximum Quantity in Q1 of 2006 will be adjusted by the actual amount delivered in January 2006.
MT is Metric Tonnes

National BioFuels

CONFIDENTIAL

CONFIDENTIAL

National BioFuels